IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MATTHEW BEISHL           :     CIVIL ACTION
                                :
     v.                      :
                                :
COUNTY OF BUCKS         :     NO. 18-2835

O P I N I O N

JACOB P. HART                            DATE:  9/17/2019
UNITED STATES MAGISTRATE JUDGE

Matthew Beishl has brought this action against Bucks County, his former employer, in connection with his dismissal.  He has asserted claims under the Family Medical Leave Act ("FMLA"), 29 USC §2601 *et seq.*, the Americans With Disabilities Act ("ADA"), 42 USC §1201, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951 *et seq.*

Bucks County ("the County") has filed a motion seeking summary judgment on all counts.  For the reasons explained below, I will grant the County's motion.

I.    Summary Judgment

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pr. 56.  The moving party has the burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In response, the non-moving party must present more than mere bare assertions, conclusory allegations, or suspicions to show the existence of a genuine issue.  Jutrowski Township of Riverdale, 904 F.3d 280, 288 (3d Cir. 2018).  It is not sufficient to reassert factually unsupported allegations contained in the pleadings.  Anderson v. Liberty Lobby, 466 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, supra, at 325.

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. <u>Anderson v. Liberty Lobby</u>, <u>supra</u> at 255; <u>Tiggs Corp. v. Dow Corning Corp.</u>, 822 F.2d 358 , 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, <u>supra</u>, at 323.

II.    <u>Factual Background</u>

A.    <u>Facts Relevant to the FMLA Claims</u>

Beishl became employed by Bucks County in March, 2006, as a custodian assigned to the County's Neshaminy Manor Nursing Home. Amended Complaint ("Complaint") at ¶¶10-11. In 2010, he was promoted to Groundskeeper Level 1, and assigned to Core Creek Park. <u>Id</u>. He remained in this position until he was fired by the County on May 8, 2017. <u>Id</u>.

In 1999, Beishl was diagnosed with esophageal achalasia. <u>Id</u>. at ¶13. This is a condition where the valve which controls the esophagus fails to relax with swallowing. Dorland's Illustrated Medical Dictionary, 31st ed. (2007) at 15. According to Beishl, his esophageal achalasia caused swallowing problems, vomiting, aspiration during sleep which could cause chest pain, and retention of food particles in the esophagus, which at least once caused a fungal infection. Deposition of Matthew Beishl, attached to Motion for Summary Judgment ("Motion") as Exhibit 6, at 20-21.

According to Beishl, the County was aware of his condition at all times during the period of his employment. Complaint at ¶13. The County, however, maintains that the third-party administrator of its FMLA program only notified the County of the parameters of FMLA leave

which was approved for an employee, in terms of dates and hours approved, and never notified it of the nature of the medical condition underlying an employee's use of FMLA.  Deposition of Travis Monroe, attached to Motion as Exhibit 5, at 95.

CIGNA, which was the third-party administrator during this period, approved a continuous period of FMLA leave for Beishl from April 23, 2014, through June 9, 2014, so that he could undergo surgery related to his esophageal achalasia.  CIGNA Leave Status Determination, attached to Motion as Exhibit 9; Beishl Deposition, supra, at 35-37.  (In Beishl's complaint, he averred that his surgery took place in 2015, but at his deposition, he said that he believed it was actually in 2014, which corresponds to CIGNA's records.  Id. at 39).

On or about July 1, 2015, CIGNA approved Beishl's request for intermittent FMLA leave from December, 2014, through December 22, 2015.  Intermittent leave, as opposed to block leave, means that the days of leave need not be taken consecutively; an employee may call out on an occasional basis, as his health condition requires.  CIGNA Leave Status Determination Notification of July 1, 2015, attached to Motion as Exhibit 13.  Beishl was approved for "8.00 hours 5 times every 1 week(s) for incapacity and 8.00 hours 4 times every 1 month(s) for Office Visit."  Id.  In his notice of approved FMLA leave from CIGNA, Beishl was also notified that he had "88 hours/2.2 weeks" of FMLA time remaining.  Id.; Beishl Deposition, supra, at 96-7.

On February 16, 2016, Beishl was notified by a supervisor that he should find his union representative and appear at a Loudermill hearing, i.e. a disciplinary or pre-termination hearing as required under Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985).  At the hearing, which took place that afternoon, the County informed Beishl that he was subject to disciplinary action for violations of the County's FMLA policy.  County of Bucks Record of Disciplinary Action, attached to Motion as Exhibit 14.

Specifically, the County accused Beishl of (a) having taken 19 days of purported FMLA leave after his leave expired on December 22, 2015; (b) having taken days of purported FMLA leave after he "ran out of hours/time in October"; and (c) failing to report to CIGNA all of the days he called out of work. Record of Disciplinary Action, supra; Complaint at ¶¶16-17; Minutes of Matt Beishl Loudermill Hearing, attached to Motion as Exhibit 15. Further, according to the County, Beishl had violated its policy that an individual taking five or more consecutive days of FMLA leave must apply for a block leave. Record of Disciplinary Action, supra.

Beishl's deposition testimony regarding the explanations he gave at his Loudermill hearing is somewhat at variance with the hearing minutes, but it is sufficient to say that Beishl told the County that his violation of FMLA policies was the result of confusion, and of having been given inconsistent or misleading information by CIGNA. Beishl Deposition, supra, at 85-88; Minutes supra.

At Beishl's deposition, this exchange took place:

DEFENDANT'S COUNSEL: And was it the County's belief that you had violated these policies over the – with the conduct leading up to this discipline?

BEISHL: The county's belief?

DEFENDANT'S COUNSEL: Correct.

BEISHL: I would say yes.

Beishl's Deposition, supra, at 88.

Beishl was given a five-day suspension. Record of Discipline, supra. The Record of Discipline reflected that further violations would result in termination. Id.

On June 29, 2016, CIGNA approved intermittent leave for Beishl from December 24, 2015 through January 11, 2016; and from February 12, 2016 through December 23, 2016. Notification of June 26, 2016, attached to Motion as Exhibit 13, Bates Stamped COB 0575. Subsequently, on December 28, 2016, CIGNA extended Beishl's intermittent leave through June 23, 2017. Id. at Bates Stamp 1137.

In its Motion, the County maintains that Beishl had unexcused absences every day for the week of January 1-6, 2017, and then called out under FMLA on every workday between January 9 and January 31, 2017. Exhibit 16 at Bates Stamp COB 0610. Beishl has not contested the accuracy of these statements. Response to Defendant's Statement of Undisputed Material Facts at ¶¶83-84.[1]

On or about January 26, 2017, Beishl's immediate supervisor, David Sutterly, called Beishl and told him that he needed to apply for continuous (or block) FMLA leave because he had missed more than four consecutive days of work. David Sutterly Deposition, attached to Motion as Exhibit 3 at 27-29. Subsequently, Beishl submitted a request for a block FMLA leave, which was approved from January 5, 2017, until February 19 or 21, 2017. Complaint at ¶21; Answer to Amended Complaint at ¶21.

According to Beishl, he underwent an endoscopy on Friday, February 17, 2017, revealing a buildup of fluid, which was then suctioned out. Beishl Deposition, supra, at 115.

On February 21, 2017, Beishl attempted to return from FMLA leave, but he was sent home by a supervisor because he had not produced a physician's note stating that he could

---

[1] Beishl denied these statements, but only on the basis that "Defendant's Exhibit 16 is a written document which speaks for itself, and all characterizations thereof are denied." Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶¶83-84.

resume normal work activities without an accommodation, which the County required for a

return from block leave.  Complaint at ¶22.  Beishl testified at his deposition:

> I was upset because I had already missed so much work, and I would have never needed
> the note if I had still had the intermittent leave as opposed to the block leave which they
> had basically told me I had to have.  Because you don't need a doctor's note when you
> have intermittent leave, at least that was my understanding.

Id. at 116.

According to Beishl, his primary physician "was on vacation or something" that week.

Id. at 118.  Beishl returned to work with a physician's note on March 1, 2017.  Id.

B.      The County's Investigation of Beishl's Use of FMLA Leave

Sometime in the month of January, 2017, while Beishl was absent on FMLA leave, one

or more of Beishl's coworkers told Jay McQuaid, the County's Operations Manager, that Beishl

played in a rock band.  McQuaid Deposition, attached to Motion as Exhibit 2 at 63-4.  McQuaid

told Richard Spencer, the County's Director of Operations, that some County employees had

seen Facebook posts from Beishl about band performances which took place "on days that he

was out."  Spencer Deposition, attached to Motion as Exhibit 1 at 86-7.

Apparently, this was not the only office scuttle-butt about Beishl.  According to

McQuaid, County employees had told him that they heard Beishl calling into sports talk radio

programs during working hours.  McQuaid Deposition, supra, at 77-8.  (It is not clear whether he

was doing this on days he was on FMLA leave, or whether he was said to be calling from work).

McQuaid reported this to Spencer, who testified that McQuaid also told him that Beishl was

rumored to take days off "surrounding different sporting events in Philadelphia."  Spencer

Deposition, supra, at 89-90.

In an email dated January 12, 2017, Spencer advised Travis Monroe and Lauren Smith in the County Human Resources department, of these developments:

Lauren and Travis,

One of our consistent FMLA users is Matt Beishl. He was disciplined last year for abuse of the County FMLA policy and put on a 3d step final notice. He was calling out to us FMLA but not calling into CIGNA. We caught it during one of our routine audits as he was over his FMLA approve[d] hours by something like 100+ hours which would have put him at 16 plus occurrences.

Matt continues to call out under his new FMLA leave granted under Standard [which replaced CIGNA as the County's third-party administrator] and intermittently uses his own regular sick, etc., whatever time he has available. It was brought to my attention recently that they had seen Matt posting on Facebook the days when he was out about the band that he plays in that performed the evening before. I did a little quick searching online and turns out he is in a band called **flabbergasted**. The majority of his callouts are around the weekends, which is also when the band plays. I also understand that the callouts tend to be around Eagles or Phillies games and have heard from others that on occasion you can hear him calling into the sports talk shows during work hours. He is very much into his sports.

I had provided a pattern of his absences in the past and was told there was not much we could do. Just wanted you to be aware of the new information surround[ing] callouts which create a staffing problem for us.

Thanks.

Email, attached to Motion as Exhibit 18. (Bold in original).

Travis Monroe responded to Spencer on the same day: "Can you provide us with the dates in which they may have coincided with his time out playing in the band? The Eagles and Phillies games will be hard to confirm but the band performances may be something we can investigate further." Id. Spencer replied: "Will compare dates." Id. He also forwarded to Monroe a link to a Facebook page which contained photographs showing Beishl performing with his band, Flabbergasted. Id.

Beginning in January, 2017, Spencer began an investigation to determine whether the coincidence between Beishl's FMLA leave days and other events created a pattern suggestive of a violation of FMLA policy. Spencer Deposition, supra, at 94, 116.

On February 21, 2017, Lauren Smith reported to Spencer that Beishl had returned to work, but without a doctor's clearance. Email of February 21, 2017, attached to Motion as Exhibit M. She wrote: "Now he just told me he won't be able to get a note until his 2/27 appt. with the doctor." Id. Spencer responded: "Well his next concert is this Friday night 2/24 at Hurricane Jack's. Wonder if his doctor cleared him to sing lead vocals Friday night. We have to do something about this abuse." Id. He received a response from Travis Monroe: "Kevin, I agree. I'll talk offline with Lauren about an approach." Id.

With Spencer's knowledge, McQuaid briefly attended the February 24, 2017, Flabbergasted concert at Hurricane Jack's, and videotaped Beishl performing as lead singer. McQuaid Deposition, supra, at 65-68. McQuaid gave the video to Spencer the following Monday morning, and told him that Beishl looked "fine" in his opinion. Id. at 69-70, 94.

C.    Subsequent Loudermill Hearings and Beishl's Termination

On March 1, 2017, when Beishl returned to work with certification from his physician, he was informed by a supervisor that he would be subject to another Loudermill Hearing. Complaint at ¶23. A meeting took place on March 20, 2017, although it is unclear from the record whether it was considered a Loudermill hearing, or more of an initial meeting preceding a formal hearing. According to Spencer, the March 20, 2017, meeting was attended by him, Lauren Smith, Jay McQuaid, and two union shop stewards, as well as Beishl. Spencer Deposition, supra, at 169.

At the March 20, 2017, meeting or hearing, Spencer accused Beishl of abusing his FMLA leave.  Id. at ¶24; Report on Matthew Beishl FMLA Use, attached to Beishl's Response as Exhibit O at 1.  Beishl was confronted with the videotape of himself performing with his band on February 24, 2017.  Beishl Deposition, attached to Motion as Exhibit 6, at 123.  Beishl pointed out that he had represented himself as healthy and able to return to work three days earlier, on February 21, 2017, and was only out on FMLA leave on the 24th because he had not obtained a doctor's note.  Id.

Nevertheless, the February 24, 2017, concert was not the only date identified at the hearing.  According to Beishl, Spencer "came up with all these strange dates", "a whole bunch of dates," and "he said there was a pattern of me calling out when I was playing with the band."  Id. at 123, 125.  As Beishl remembered it, the March 20, 2017, meeting "kind of focused around the band."  Id. at 127.

Spencer testified at his deposition that Beishl stated in his own defense that "I felt better in the afternoon."  Spencer Deposition, supra, at 172.  Beishl also explained to them that the had an intermittent condition which "could flare up at any given time":  "During that meeting he actually explained to us what his condition was even though we did not ask him to because we don't get involved in what medical conditions are part of this."  Id.

Spencer further testified:

One of the questions that we asked him and discussed with him was, is there a reason why that if it could flare up at any time, there seems to be more of a concentration in the winter months versus summer months.  There tends to be a concentration around weekends and holidays versus we would expect to see a more random pattern with something that could be generally at any minute.  We talked about the patterns that we had seen there and asked him.  He really didn't have much of an answer for that.

Id. at 172-3.

Spencer also remembered Biehl saying that in wintertime, it stressed him to have his workplace temporarily transferred from Core Creek Park to the Neshaminy Manor Nursing Home.  Id. at 173.  (The subject of the wintertime transfers will be discussed in detail below, as it pertains to the ADA claims).

It is not clear what, if anything, was resolved at the March 20, 2017, meeting, or if it was essentially to give Beishl notice of the subject of an impending Loudermill hearing.  In any event, on the morning of April 19, 2017, Beishl was given a written Notice of Loudermill Meeting signed by Spencer, in which it was written:

> It has come to my attention that you may have conducted yourself in a manner that violates the Policies, Rules, and Regulations of the County of Bucks.  A statement of events, which may serve as the basis for the imposition of discipline against you, is set forth below:
>
> Event:  Abuse of County FMLA policy related to repeated callouts following a two or three day pattern around weekends and also occurring on same dates as concerts for which the employee was performing with his band.  Employee also has a pattern of calling out around holidays while working a day before or after so that employee would receive Holiday pay.  Employee received a step III final discipline in 2016 for the similar events of FMLA abuse.

County of Bucks Notice of Loudermill Meeting, attached to Plaintiff's Response as Exhibit O, at Bates Stamp COB 0615.

The Notice also stated that Beishl was accused of violating County Work Rules pertaining to family and medical leave, dishonesty, excessive tardiness or absenteeism, and "action that is in any way detrimental to employee morale.  Id.

The hearing took place that afternoon.  According to Spencer, at the April 19, 2017, hearing, Beishl was presented with "a lot of the same information" they had discussed at the March 20, 2017, hearing.  Spencer Deposition, supra, at 178.

A report authored by Spencer, and dated May 3, 2017, states:

April 18, 2017 [*sic* 19]: … At the meeting we reviewed the attendance patterns, attendance record, FMLA leave use specifically leave taken on same days as band concerts where Matt performed. Matt admitted to performing in the band on same days or around the same days that he had called out for FMLA related reasons. Matt also confirmed that the video of him singing at the February 24th concert was indeed him and that this was also one of the days he had called out sick for FMLA. Matt stated that his medical condition was intermittent and he never knew when a medical event would occur that would render him incapable of performing his job as a grounds employee in the parks.

County of Bucks Report on Matthew Beishl FMLA Use, attached Motion as Exhibit 16, and to

Response as Exhibit O.[2]

Beishl testified at his deposition that at the April 19, 2017, hearing:

I had said that playing with the band was completely unrelated to missing work. I mean there was plenty of times, I remember saying, "I played with the band and worked the same day. I never missed work the day after playing with the band. They have nothing to do with each other." I remember saying – I asked him who was complaining about working with me. Because he said it was affecting employee morale. I said, "I get along with everybody." I didn't understand that. I didn't really understand any of it.

…

They brought up the FMLA from the time that I had been calling out and it was exhausted … . I said, "I didn't do that here." … I did not ever – I made sure that that didn't happen again. They brought that up again. I guess they connected them somehow. I don't know.

Beishl Deposition, <u>supra</u>, at 131.

Beishl was asked at his deposition: "And did he [Spencer] believe that you had abused

your FMLA leave?" <u>Id</u>. at 129. He responded: "Yes." <u>Id</u>.

---

[2] Notably, the statements attributed to Beishl in Spencer's May 3, 2017, report were said to have been made on April 19. However, at his deposition, Spencer testified that Beishl made these statements on March 20. It is possible that Beishl made the same statements at both hearings, although it is also possible that Spencer was simply confused at his deposition. Fortunately, this disparity does not seem to be of importance.

As noted, Spencer prepared a report, which was dated May 3, 2017, entitled Report on Matthew Beishl FMLA Use.  Beishl Report, supra, attached to Motion as Exhibit 16.  In it, Spencer detailed his accusations, citing as supporting evidence:

- "Calendars from 2015, 2016 & 2017 where employee leave time was plotted and color coded according to the reason the employee was out from work.  The calendar highlights various events (holidays, sporting games, concert events, and time of year) around which attendance patterns occur … ";
- The Flabbergasted concert schedule;
- February 19, 2016, Disciplinary Action form notifying Beishl that any future violations of FMLA leave policy would lead to termination;
- Posts from Flabbergasted's Facebook page; and
- Video from the February 24, 2017, Flabbergasted concert.

Id. at Bates Stamp COB 0579.

The report did reflect Beishl's statement that it "was more difficult to travel up to Neshaminy Manor" in the winter.  Id.  However, it also set forth three Flabbergasted concerts which occurred while Beishl was out under FMLA, one concert which took place the day after a FMLA leave day, and one which took place on a day on which Beishl took excused leave without pay.  Id.  Notably, although the February 24, 2017, Flabbergasted concert took place after Beishl attempted to return to work, there was also a concert on January 14, 2017, during the month Beishl never appeared at work, and one month before his endoscopy.  Id.  Spencer also cited ten Eagles games which were played during, the day before, or the day after, Beishl took FMLA leave.  Id.

Further, Spencer noted ten times in 2016 that Beishl had taken FMLA leave "which was concentrated around weekends or holidays": put another way, the FMLA days included a Monday or a Friday, thereby creating long weekends or long holidays.  Id.  In one instance, Beishl took FMLA leave from May 20 through June 2, which reportedly included one Flabbergasted concert, Memorial Day, and the following weekend.  Id.

The report concluded: "It is my recommendation that Matt Beishl be terminated for continued violation of FMLA leave abuse [*sic*] and potential fraud. It is also my recommendation that this matter be turned over to the Controller's office and potentially the District Attorney's office to determine if fraud has taken place as FMLA is a federal policy." Id. at Bates Stamp COB 0580. Attached to the report was Spencer's color-coded calendar.

Spencer forwarded his report to Monroe and Smith in Human Relations, with a note seeking a meeting with Brian Hessenthaler, the County's Chief Operating Officer, and the county solicitor. Spencer Deposition, supra, at 150. Monroe agreed with Spencer's recommendation that Beishl be terminated based on the information in Spencer's report. Deposition of Travis Monroe, at 77-8. Hessenthaler approved the termination, based on the pattern of absences described by Spencer in his report. Brian Hessenthaler Deposition, attached to Motion as Exhibit 20 at 31-2.

In a meeting which took place on May 8, 2017, Spencer informed Beishl that the County was terminating his employment for FMLA abuse. Complaint at ¶26. Beishl filed a grievance over his termination, but at the third level, Scott Miller, his union representative, informed him that the union would not represent him at arbitration. Beishl Deposition, supra, at 139.

This case was filed on July 5, 2018. It originally included ADA and PHRA claims asserting a failure to accommodate, as well as the claims discussed herein. Those counts were dismissed by the Honorable Timothy J. Savage in a December 27, 2018, decision ruling on the County's Motion to Dismiss for Failure to State a Claim.

D.     Facts Pertinent to the ADA and PHRA Claims

The facts discussed below overlap temporally with the facts discussed above, and there is also overlap in the subject matter, since they all create one series of events.  The facts in this section, however, are more central to Beishl's remaining ADA and PHRA claims, and for the purposes of clarity I have set them forth separately.

Beginning before Spencer became the Director of Operations, and at least since December, 2014, the County temporarily relocated a number of Grounds Department employees during the winter months from county parks to other county locations.  Spencer Deposition, supra, at 68; Beishl Deposition, supra, at 40-41.  Spencer stated at his deposition that this occurred because, in the winter, "there is a lack of work outside."  Id.

Since December, 2014, Beishl was sent for the winter months from Core Creek Park to work at the Neshaminy Manor, with periods spent working at other locations as well, such as the courthouse and the health department.  Beishl Deposition, supra, at 41-44.  Grounds Department employees other than Beishl were also relocated for the winter.  Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶32.

On or about December 1, 2014, while working at the Neshaminy Manor, Beishl submitted to the County a Bucks County ADA Accommodation Request form.  County of Bucks ADA Accommodation Request, attached to Response as Exhibit D.  In this form, Beishl stated that his medical impairment was "achalasia."  Id.  He wrote that it:  "Causes problems eating, sleeping, chest pain, swallowing, vomit during sleep, severe acid reflux."  Id.

Beishl wrote in his ADA request that his job duties at Core Creek Park were not affected by his achalasia. Id. However, he wrote: "My request is to remain at my current reporting location, shift and duties (Core Creek, 7 a.m.-3:30 p.m., Grounds Level I)" because his "body has adapted to sleep patterns, increased travel times due to transfer will cause my health to deteriorate." Id.

Beishl's ADA request led to a meeting with Travis Monroe of the Human Relations Department on December 4, 2014. Beishl Deposition, supra, at 28-29. At that meeting, Beishl explained to Monroe that, aside from his medical reasons for wanting to return to Core Creek Park, he also had "family issues" in that his wife was struggling with a drinking problem Id. at 31-2. According to Beishl, Monroe told him that if he was to "accept the accommodation," a more senior employee would be moved in place of him "and it was going to be an issue." Id. at 30.

At his own deposition, Monroe said that he had no recollection of this conversation with Beishl, but that, generally "other employees being impacted wouldn't come into focus on my considerations that I would make for that individual, so just generally speaking that doesn't make any sense or sound like anything I would say because it doesn't have any relevance to what the employee's requesting." Monroe Deposition, supra at 96.

Beishl also spoke to Gerry Anderson, who was then the Director of Operation. Id. at 42. After this, and after speaking with his wife, Beishl decided that "it would not be a good idea" to pursue the ADA accommodation because he "didn't want to make waves" with other union members. Id. at 30-31. Beishl testified that, aside from exploring the possibility of an ADA accommodation, he filed a union grievance regarding his temporary transfer in the winter of

2014-2015, but testified at his deposition: "I think I may have dropped it" because his shop steward told him the issue was a matter of county policy, and could not be grieved. Id. at 45.

Beishl testified that, after he was returned to Core Creek Park, he was given "harder jobs, more work." Beishl Deposition, supra, at 92, 108-9. He felt that he was being "targeted." Id. at 109. This occurred between 2015 and 2017. Id.

The next winter, that of 2015-2016, Beishl and a number of other Grounds Department employees were again relocated. In Beishl's Complaint, he alleges that, at the February 16, 2016, Loudermill hearing discussed above, he "relayed how taxing working at … Neshaminy Manor … was on his health." Complaint at ¶17. The County denies this occurred, writing in its Answer that, at that meeting, Beishl never "referenced his purported desire not to work at Neshaminy Manor or the purported effects of his temporary assignment to Neshaminy Manor on his health." Answer to Amended Complaint at ¶17.

In any event, in the winter of 2016-2017, five Grounds Department staff were temporarily relocated. Spencer Deposition, supra, at 67-8. Sometime in the first few days of December, Spencer told David Sutterly, Beishl's direct supervisor, to tell Beishl to report on Monday, December 5, 2016, to the loading dock at the Bucks County Courthouse. Sutterly Deposition, supra, at 14. When Sutterly did this, Beishl asked not to be relocated because his wife was having "some issues." Id. at 15. He did not mention his own health. Id. Sutterly told Beishl that it was not his decision to make, and that the decision came from Spencer. Id. at 16.

On December 2, 2016, Beishl sent Spencer the following email:

Kevin, I'm contacting you in an appeal to not be moved, not because of the Union, but because of my family. Please keep what I say confidential, but aside from my health issues, my wife and I are having problems, and I need to be close to home. She is battling alcoholism, and has been for some time. She lost her job as well. I've tried in the past to get her help, and over Thanksgiving, she went into Lower Bucks Hospital to dry out. I never know what to expect, and my two girls (9 and 11) are also in deep

emotional stress. We've been recommended to therapy and I've contacted CIGNA about the county program again. I even attempted to move to weekends to avoid being so far away. Please, I don't want grievances and all the surrounding turmoil. I will break my stones to the best of my ability. I'll beg if I need to. I'm the only income of the house, missing work kills me financially, so please don't think I'm a lazy person. The stress is horrible. Please help. Sincerely, Matt Beishl.

Email, attached to Response as Exhibit R, Bates Stamp COB 1469.

Spencer responded the same day:

Matt, the selection of the employees for winter relocation was not up to management. We just asked for the union to provide us with 5 staff who would be moving as we do not have enough work for grounds during the winter. I can only recommend working out a solution with one of your fellow employees.

I do want you to know that you should contact the County's EAP for counseling (attached). CIGNA or IBC would be the contact for leave time. I will be praying for you and your family during this time.

Id. at Bates Stamp 1468.

Beishl wrote back to Spencer the same afternoon, in two separate emails, repeating his request to stay at Core Creek Park, and asking for Spencer to reconsider his answer. Id. at Bates Stamp 1467 and 1468. He wrote that Scott Miller, the union representative, told him that: "this is a management decision of who moves." Id. at Bates Stamp 1467. In these two emails, Beishl did not repeat his reasons for wanting not to be relocated, except in writing: "Please take my circumstances into consideration." Id. On December 3, 2016, however, Spencer wrote to Beishl again, explaining that "We have a shortage of staff at the manor and administration building and need help on winter projects." Id. He wrote: "I will reiterate that if you can work out with another Core Creek employee that would be your best option." Id. Beishl responded: "Thanks for your time." Id.

Beishl was reassigned that winter. However, as discussed above, he was out of work on FMLA leave from Monday, January 2, 2017, through March 1, 2017.

17

III.   Discussion

A.   Count I

1.   Legal Principles

In the first count of Beishl's complaint, he alleges that the County unlawfully retaliated against him for exercising his statutory rights under FMLA.  As the Court of Appeals for the Third Circuit has explained:

> When employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights.  29 USC § 2615(a)(1).  Nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful.  29 USC §2615(a)(2).  The former provision is generally, if imperfectly, referred to as "interference" whereas the latter is often referred to as "retaliation."  Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).  Although neither provision expressly forbids employers from terminating employees "for having exercised or attempted to exercise FMLA rights," a Department of Labor regulation has interpreted the sum of the two provisions as mandating this result.  See 29 CFR §825.220(c).  Under this regulatory interpretation, employers are barred from considering an employee's FMLA leave "as a negative factor in employment actions such as hiring, promotions or disciplinary actions."  Id.

Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294, 300-302 (3d Cir. 2012).

FMLA retaliation claims are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Lichtenstein, supra, at 302; Wilson v. Graybar Electric Company,  Civ. A. No. 17-3701, 2019 WL 1229778 at *21 (E.D. Pa. 2019).  Under this framework, Beishl must first establish a *prima facie* case of retaliation by pointing to evidence in the record sufficient to create a genuine factual dispute as to each of these elements: (1) he invoked his right to FMLA leave; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to his invocation of his FMLA rights.  Id. at 300-302.

If a plaintiff is successful in setting forth a *pro se* case of FMLA retaliation, the burden of proof shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action.  Id., citing McDonnell Douglas, supra, at 411 U.S. 802.

If the defendant meets this "minimal burden", the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably disbelieve the County's articulated legitimate reason.  Id., citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). To survive summary judgment, the plaintiff does not need to prove that his invocation of his FMLA rights was the sole, or even the most important, factor upon which the employer based its action.  Fuentes, supra, at 764.  However, his evidence rebutting the defendant's proffered legitimate reasons must allow a factfinder reasonably to infer that the proffered reason was pretextual; i.e., that it was either a *post hoc* rationalization, or otherwise did not actually motivate the employment action.  Id.

Crucially, it is not sufficient for a plaintiff to show that his employer's decision was wrong or mistaken, since the factual dispute at issue is whether the decision was motivated by discrimination, and not whether the defendant employer was wise, prudent, or even competent. Id. at 765.  Instead, in responding to a summary judgment motion, a plaintiff must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendant's proffered reasons that a finder of fact could rationally find that reason "unworthy of credence." Id., citing Ezold v. Wolf, Block, Shorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992), *cert. denied* 510 U.S. 826 (1993).

Specifically in the context of FMLA retaliation cases, this principle has been described as an "honest belief rule", whereby, in a FMLA retaliation case, "the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest*.'"  Capps v. Mondelez Global, LLC, 847 F.3d 144, 153 (3d Cir. 2017), citing Gustovich v. AT&T Communications, Inc. 972 F.2d 845, 848 (7th Cir. 1992); Arana v. Temple

University Health System, Civ. A .No. 17-525, 2018 WL 2063600 at *7 (E.D. Pa. May 3, 2018);

Isley v. Aker Philadelphia Shipyard, Inc., 275 F. Supp.3d 620, 629-630 (E.D. Pa. 2017).

This nomenclature appears to have originated in the Seventh Circuit, where the Court of

Appeals wrote in a case involving COBRA:

> Discrimination statutes allow employers to discharge employees for almost any reason
> whatsoever (even a mistaken but honest belief) as long as the reason is not illegal
> discrimination. Thus, when an employee is discharged because of an employer's honest
> mistake, federal anti-discrimination laws offer no protection.

Capps, supra, citing Kariotis v. Navistar International Transportation Company, 131 F.3d 672,

680 (7th Cir. 1997).

As an example of how the honest belief rule works in practice, the Capps court discussed

Scruggs v. Carrier Corp., 688 F.3d 821, 827 (7th Cir. 2012): "Where the evidence demonstrated

that the employer held an honest suspicion that the employee was misusing his FMLA leave at

the time it made the decision to terminate the employee, the Seventh Circuit found that the

evidence could not support a conclusion that the employer intentionally discriminated against the

employee for taking FMLA leave." 847 F.3d at 153. Scruggs is obviously relevant to the matter

at hand.

2.    The Facts of This Case

Beishl has certainly shown that he invoked his right to FMLA leave, and that he was

terminated. He has not, however, come forward with evidence upon which a factfinder could

reasonably rely in finding that his termination was causally related to his invocation of his rights

under FMLA. The overwhelming trend of the evidence suggests that the County did not fire

Beishl because he took FMLA leave, but because the County believed he abused it. He has not,

therefore, demonstrated a *prima facie* case of FMLA retaliation.

Even if I were to find that Beishl set forth a satisfactory *prima facie* case of FMLA retaliation, this same evidence is insufficient under the burden-shifting framework of <u>McDonnell Douglas</u> to permit a factfinder to reasonably disbelieve the County's articulated reason for Beishl's termination, i.e., FMLA abuse.

In defending this claim, Beishl maintains that the County's explanation is "riddled with contradictions, inconsistencies, and implausibilities." Response at 17. He primarily supports this by factually attacking the County's calendars which purported to show his pattern of FMLA abuse.

> During his employment, Plaintiff utilized 94 FMLA days in total. Of those 94 days, he only played with his band on two of those days or approximately 2% of his FMLA days. In fact, Plaintiff played with Flabbergasted and did not take FMLA leave on more occasions (eleven days). Therefore, if anything, there was a pattern of not using FMLA days during Flabbergasted concerts. Moreover, the two days that he actually did use FMLA on the same day as a concert are easily explained. The first date, December 23, 2016, was the Friday night before Christmas Eve and Christmas Day, when Plaintiff would not have been scheduled to work anyway. … On the second date, February 24, 2017, Plaintiff was out on **forced** FMLA leave. Plaintiff attempted to return to work on February 21, 2017, but was sent back out due to allegedly not having a "note" clearing him to return to work.
>
> …
>
> Finally, while Plaintiff utilized FMLA leave on 37 Mondays or Fridays, he utilized **57** FMLA days on Tuesdays, Wednesdays, or Thursdays.

Response at 17-18 (internal citations omitted; bold in original).

At most, this pokes holes in the County's methodology. For example, although Beishl relies upon the fact that he only performed in two rock concerts on days when he was actually on FMLA leave, the County relied upon Spencer's report which stated that there were three such days: December 23, 2016, January 14, 2017 and January 24, 2017. Report on Matthew Beishl FMLA use, <u>supra</u>, at Bates Stamp COB 0579. Further, Spencer's report indicated that, between November, 2016, and May, 2017, Beishl also took FMLA leave on one day before a concert; and

performed on one day when he was on unexcused leave.  Id.  As mentioned above, this included a concert on January 14, 2017, which was flatly in the middle of his block FMLA leave.  Id.

Equally, it is apparent from Spencer's report that many of the Tuesday, Wednesday, and Thursday FMLA days Beishl cites were adjacent to Mondays or Fridays, and therefore created the long weekends which the County found suspicious.  Report, supra, at Bates Stamp 0579.

Thus, at most, Beishl has shown that the calendars Spencer relied upon in preparing the report on which the County relied in terminating his employment were less than perfect, and less than unambiguous.  He has not, however, shown that the calendars were so implausible and/or incoherent that they were clearly a pretext for discrimination.

Beishl argues that performing with his band on or close to FMLA days is not suggestive of fraud, because – as Spencer admits Beishl told him – he "often felt better by the afternoon on days where he had to utilize FMLA leave."  Spencer Deposition, supra, at 171.  This may be the literal truth.  However, as explained in Fuentes and Capps, that is not crucial here.  What is important is that Beishl has not shown that the County did not honestly believe he committed FMLA abuse.

On the contrary, the evidence indicates that Spencer and the other County decisionmakers honestly believed – rightly or wrongly – that an individual who was capable of screaming rock lyrics into a microphone in a bar until the small hours of the morning was capable of coming to work that day or the day before.  According to both McQuaid and Spencer, the investigation into Beishl's use of FMLA time was precipitated by co-worker rumors that Beishl posted on Facebook about performing with his band "on days that he was out," and that he took days off "surrounding different sporting events."  McQuaid Deposition, supra, at 63-4, Spencer Deposition at 86-7, 89-90.

Even emails exchanged between Spencer, Monroe, and Smith indicate that County decisionmakers believed that performing rock concerts on FMLA days was evidence of misuse. As above, Spencer texted Smith about the February 24, 2017, performance: "Wonder if his doctor cleared him to sing lead vocals Friday night. We have to do something about this abuse." Email of February 21, 2017, supra. Monroe replied: "I agree." Id.

There is no evidence to the contrary. Beishl argues that, when Spencer initially wrote to Smith and Monroe, on January 12, 2017, his predisposition to find an excuse to fire Beishl was demonstrated in the statement: "I had provided a pattern of his absences in the past and was told there was not much we could do." Motion Exhibit 18, supra. However, Spencer's reference to Beishl's "pattern" of absences may indicate that he had earlier wondered whether Beishl was misusing his FMLA leave.

When questioned about this at his deposition, Spencer stated that he did not challenge an employee's right to take necessary medical leave:

ATTORNEY: His FMLA creates a staffing problem, right?

SPENCER: Not his FMLA. Time out of work creates a staffing problem. Employees are entitled to the leaves that they have.

ATTORNEY: Right. But if they take a day off for their FMLA, it creates a staffing problem, right?

SPENCER: It may in some situations, yes. But that's not to say that they are not entitled or able to take their time. What we're looking at is whether or not the time they're taking is in accordance with what they've been granted and approved.

Spencer Deposition, supra, at 92.

Beishl further argues that pretext is demonstrated by the fact that he was fired for performing with a rock band and attending sporting events during non-work hours, even though the County had no policy precluding employees from engaging in these activities: "as a result, Defendant essentially terminated Plaintiff for something he was permitted to do, which is the essence of pretext." Response at 19.

This argument is not persuasive. There is no evidence that Beishl's leisure activities were of interest to the County except in that he was believed to be using FMLA time to facilitate them, rather than for its intended purpose. The only references in the evidence to Beishl's band, or to football, is in the context of determining whether his pattern of FMLA use suggested fraud. Beishl was not fired for being in a rock band, or attending Eagles games. He was fired because the County believed – again, whether rightly or wrongly – that he took FMLA time to do so.

Finally, Beishl argues that the concept of "honest belief", as described in Capps and Kariotis does not apply in this case. Beishl argues that, unlike Kariotis, who apparently was subject to dismissal for "almost any reason whatsoever," Beishl, was a union member who could only be fired for cause. Response at 20, citing Brian Hessenthaler Deposition, supra, at 23. This is a non sequitur. Any rights Beishl may have had under his union's collective bargaining agreement created an issue which is completely separate from whether the County's articulated position that it fired him for FMLA abuse was a pretext for discrimination.

Because Beishl has not pointed to evidence in the record sufficient to create a genuine factual dispute as to whether his termination was casually related to his having taken FMLA leave, this count cannot survive summary judgment.  Even if Beishl were deemed to have set forth a *pro se* case of FMLA retaliation, this count would still be properly dismissed because he has not successfully rebutted the County's articulated legitimate reason for his termination.

B.      Disability Discrimination;  the ADA and PHRA

Under the ADA, an employer is prohibited from discriminating against a qualified individual with a disability because of the individual's disability.  42 USC §12112(a).  In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (3) he has suffered an adverse employment decision as a result of discrimination.  Taylor v. Pheonixville School District, 184 F.3d 296, 305-6 (3d Cir. 1999).

As a practical matter, it is not clear what is left of Beishl's ADA claim other than retaliation, following Judge Savage's December 27, 2018, Opinion dismissing the claim of failure to accommodate.  However, in its Motion for Summary Judgment, the County treated the claim of disability discrimination separately from the ADA retaliation claim, so I will do the same.

As above, the evidence is not reasonably interpreted as showing that the County terminated Beishl for any reason other than that it believed he had abused his FMLA leave.  For that reason, Beishl will not be able to show that he was terminated as a result of discrimination on the basis of disability.

Beishl argues that the County terminated his employment because of the unpredictable nature of his esophageal achalasia, which could lead him to call out sick at inopportune times. Beishl Deposition, supra, at 137-8. However, he has not pointed to evidence which could corroborate this. As discussed above, Spencer testified at his deposition that, although employees' FMLA leave could create staffing problems, "that is not to say that they are not entitled or able to take their time." Spencer Deposition, supra, at 92.

There are no letters, emails, or other evidence showing that Spencer resented Beishl having an illness. As above, Beishl has shown that Spencer asked the Human Relations about his leave patterns earlier than 2016 ("I had provided a pattern of his absences in the past…"). However, it would be nothing more than unsupported speculation to assume that the subtext was that Spencer disapproved of Beishl taking FMLA time. Notably, Spencer stated that he had been concerned with Beishl's "pattern of absences", and not the mere fact of his absences.

As evidence of ADA discrimination, Beishl also states that "the Defendant subjected Plaintiff to three Loudermill hearings due to his usage of FMLA leave in order to treat his disability." Response at 21. Yet, here again, the evidence shows that the three Loudermill hearings were held to determine whether Beishl abused his FMLA leave, not simply because he used FMLA leave. As Spencer testified: "What we're looking at is whether or not the time they're taking is in accordance with what they've been granted and approved." Spencer Deposition, supra, at 92.

Beishl testified at his deposition that, when he spoke to Travis Monroe in early December, 2014, about seeking an accommodation under the ADA to prevent his temporary relocation from Core Creek Park, "Monroe dissuaded [him] from doing so" on the basis that it would inconvenience other workers. Response at 21. He argues that this showed hostility to his

need for ADA accommodation. Monroe testified at his own deposition that he would not have said these things to Beishl. Monroe Deposition, supra, at 96. Clearly, whether or not Travis told Beishl that his proposed ADA request would inconvenience others is an issue of fact which can not be resolved on a motion for summary judgment.

However, Beishl's conversation with Monroe took place 25 months before the County began investigating Beishl's use of his FMLA leave, and 30 months before his termination. Beishl's 2014 inquiry regarding ADA accommodation was never mentioned during the investigation, or at any of the Loudermill hearings. Standing alone, therefore, it cannot be reasonably considered causally connected to the employment action at issue here – namely, Beishl's termination.

Beishl suggests that the County's rejection of his requests in the winters of 2015-2016 and 2016-2017 to remain at Core Creek Park also constituted hostility to his desire to obtain ADA accommodation. Leaving aside the fact that Judge Savage has already ruled that a request for a shorter commute is not a reasonable request for accommodation under the ADA, the evidence shows that Beishl did not ask to remain at Core Creek Park because of his esophageal achalasia those years, but because of his family troubles. Indeed, Beishl never filed an ADA Accommodation Form after December, 2014, despite obviously knowing after 2014 that this was the way to obtain ADA accommodation form the County.

Further, in the entire email exchange between Beishl and Spencer in December, 2016, Beishl discussed his wife's challenges and his family's financial issues, but mentioned his own health only in the clause "but aside from my health issues … ." This might be enough to constitute a request for ADA accommodation if it referred back to some prior, more detailed, communication with Spencer explaining how a longer commute would affect his health, but

Beishl has not even alleged that there was any another communication with Spencer about his esophageal achalasia.  The phrase "but aside from my health issues", standing alone, is insufficient to invoke the ADA, particularly because it specifically points to reasons for his request *other than* his health issues.[3]

The only other evidence to which Beishl points in arguing that he can show the County's hostility to his alleged disability is Hessenthaler's rhetorical question at his deposition:  "If the issue is with his throat, how could he be a lead singer in a rock group?"  Hessenthaler Deposition, <u>supra</u>, at 32.  However, this does not express animosity or negative view about Beishl as an employee with a disability, as it might have if Hessenthaler had said:  "If the issue is with his throat, how could he be a groundskeeper for the County?"

Rather, Hessenthaler's testimony adds to the evidence that the County decisionmakers believed that Beishl did not actually suffer from disabling symptoms on occasions when he took FMLA leave on the day of, or immediately before or after a rock performance.

As a whole, therefore, Beishl has not come forward with evidence sufficient to permit a finder of fact to find a causal link between his alleged disability and any adverse employment action by the County.  (In that regard, it can also be noted that Beishl has not shown any comparator evidence to prove that employees other than him were treated more favorably).  This also compels the dismissal of his discrimination claim under the PHRA, because the same analysis is used analyzing a PHRA claim.  <u>Taylor v. Pheonixville School District</u>, 184 F.3d 296, 306 (3d Cir. 1999).

---

[3] Spencer testified:  "My understanding is, I read that he was making an appeal on his wife's behalf and the condition that he was dealing with of his wife at the time, being closer to home for the kids, some things that they were dealing with as a family … He said aside from my health issues.  To me, that's him putting aside whatever health issues he had … ."  Spencer Deposition, <u>supra</u>, at 174.

C.    <u>Retaliation Under the ADA and PHRA</u>

The ADA contains an anti-retaliation provision, which states that:  "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 USC §12203(a).

Claims of ADA retaliation are analyzed under the <u>McDonnell Douglas</u> burden shifting framework.  <u>Shaner v. Synthes (USA)</u>, 204 F.3d 494, 500 (3d Cir. 2000).  Thus, to establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.  <u>Krouse v. American Sterilizer Company</u>, 126 F.3d 494, 500 (3d Cir. 1997).

A request for FMLA leave may, under certain circumstances, qualify as a request for a reasonable accommodation under the ADA.  <u>Capps</u>, <u>supra</u>, at 847 F.3d at 156.  In this case, Judge Savage has already found that Beishl's requests not to work at Neshaminy Manor and for FMLA leave constitute protected activity under the ADA.  Opinion of December 27, 2018, at 14. Therefore, Beishl has shown the first of the elements set forth above.  Certainly, Beishl was terminated after his protected activity, so the second element is established.

Judge Savage also found that the three months between Beishl's third request that he not be transferred to Neshaminy Manor and his termination was not such a long period as to preclude a finding of a causal connection.  <u>Id</u>. at 14-15.  For that reason, he declined to dismiss Beishl's retaliation counts.

Nevertheless, only a gap of a few days between a protected action and a termination is sufficient, standing alone, to show a causal connection. Fusco v. Bucks County of Pennsylvania, Civ. A. No. 08-2082, 2009 WL 4911938 at *12 (E.D. Pa. 2009), citing Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001) and Jalil v. Avdel Corporation, 873 F.2d 701, 708 (3d Cir. 1989). Thus the three month period identified by Judge Savage does not in itself show a causal connection.

As Beishl points out, timing which exceeds a few days can be sufficient to show a causal link when taken together with other types of suggestive evidence. See Fusco, supra, citing Abrahamson v. William Paterson College of New Jersey, 260 F.3d 265, 289 (3d Cir. 2001). A broad array of evidence may show a causal link, such as ongoing antagonism, or vague and inconsistent reasons for the termination. Abrahamson, supra, at 289.

Unlike in Abrahamson, however, there was never anything vague or inconsistent about the reasons given for Beishl's termination. The County has been exceptionally explicit and consistent in expressing directly to Beishl, in communications between County decisionmakers, and in discovery, that Beishl was fired for what the County found to constitute an abuse of his FMLA leave. Nor, as discussed in the prior section, has Beishl shown a pattern of antagonism toward him based on his disability. The factors mentioned in Abrahamson are not, of course, an exclusive list of ways that a causal link can be shown. Here, however, no "other types of suggestive evidence" are present.

Consequently, Beishl has not shown a *prima facie* case of ADA retaliation, and this count of his complaint is also subject to summary judgment. The identical PHRA retaliation claim must also be dismissed, because it, too, is analyzed under the McDonnell Douglas framework. Marra v. Philadelphia Housing Authority, 497 F.3d 286, 300 (3d Cir. 2007).

IV.    Conclusion

For the reasons set forth above, Defendant County of Bucks' Motion for Summary

Judgment will be granted on all counts, and this matter dismissed with prejudice.

BY THE COURT:


/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE